**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

**CASE NO. 12-1242**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE**
**DISTRICT OF COLUMBIA CIRCUIT**

**BNP PARIBAS ENERGY TRADING GP**
*Petitioner*,

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION,**
*Respondent*

**PETITION FOR REVIEW OF ORDERS**
**OF THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

**BRIEF OF PETITIONER BNP PARIBAS ENERGY TRADING GP**

> **Gordon J. Smith**
> **Matthew T. Rick**
> **JOHN & HENGERER**
> **1730 Rhode Island Ave., N.W.**
> **Suite 600**
> **Washington, D.C. 20036-3116**
> **Telephone: (202) 429-8814**
> **Email: gsmith@jhenergy.com**
>
> **Attorneys for Petitioner**
> **BNP Paribas Energy Trading**
> **GP**

**Initial Brief: October 31, 2012**

CASE NO. 12-1242

IN THE UNITED STATES COURT OF APPEALS
FOR THE
DISTRICT OF COLUMBIA CIRCUIT

BNP PARIBAS ENERGY TRADING GP
*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*

PETITION FOR REVIEW OF ORDERS
OF THE
FEDERAL ENERGY REGULATORY COMMISSION

BRIEF OF PETITIONER BNP PARIBAS ENERGY TRADING GP

CERTIFICATE OF COUNSEL AS TO PARTIES,
RULINGS AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioner BNP Paribas Energy Trading

GP (*f/k/a* Fortis Energy Marketing & Trading GP) hereby furnishes the following

information:

**Parties and *Amici*:**

According to the official service list maintained by the Federal Energy

Regulatory Commission, the following parties, intervenors, and *amici* appeared in

the proceedings of the Federal Energy Regulatory Commission involving the

orders under review in Docket Nos. RP06-569 and RP07-376:

AGL Resources Inc.
Atlanta Gas Light Company
Atmos Energy Corporation
Baltimore Gas & Electric Company
BP Energy Company
Calpine Corporation
Carolina Power & Light Company
Chesapeake Utilities Corporation
Chevron Natural Gas
Chevron USA Inc
City of Richmond Virginia
ConocoPhillips Company
Consolidated Edison Development Inc.
Consolidated Edison Energy Inc.
Constellation Energy Resources LLC
Constellation Energy Commodities Group
Constellation NewEnergy Inc
Coral Energy Resources LP
DC Energy
Dominion Resources Inc
Dominion Resources Services Inc
Duke Energy Pipelines
El Paso Corporation
Enbridge Marketing (US) LP
Exelon Business Services
FPL Energy Inc.
Gulf South Pipeline Company LP
Hess Corporation
Keyspan Corporate Services
Kinder Morgan Interstate Gas Pipelines
Louisiana Municipal Gas Authority
National Fuel Gas Distribution Corp.
New Jersey Natural Gas Company
NiSource Distribution Companies
NJR Energy Services Company

North Carolina Utilities Commission
Peco Energy Company
Pennsylvania Office of Consumer Advocate
Philadelphia Gas Works
Piedmont Natural Gas Company Inc.
PPL EnergyPlus LLC
PPL Electric Utilities Corporation
PSEG Services Corporation
PSEG Energy Resources & Trade LLC
Public Service Commission of New York
Public Service Company of North Carolina
SCANA Corporation
SC Office of Regulatory Staff
Sempra Global
Shell NA LNG LLC
South Jersey Resources Group LLC
Southern Natural Gas Company LLC
Statoil Natural Gas LLC
Tennessee Gas Pipeline Company
The Williams Companies
TransColorado Gas Transmission Company
Transcontinental Gas Pipe Line Corp
UGI Corporation
UGI Utilities Inc
UGI Penn Natural Gas Inc
Washington Gas Light Company
Williams Power Company Inc

**Rulings Under Review:**

(i)     Opinion No. 507, "Order on Initial Decision," *Transcontinental Gas Pipe Line Corp*., 130 FERC ¶ 61,043 (issued January 21, 2010); and

(ii)    Opinion No. 507-A, "Order on Rehearing," *Transcontinental Gas Pipe Line Corp*., 139 FERC ¶ 61,002 (issued April 2, 2012).

**Related Cases:**

There are no related cases.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Fed.R.App. 26.1, and Circuit Rule 26.1, Petitioner BNP Paribas Energy Trading GP (*f/k/a* Fortis Energy Marketing & Trading GP) ("BNPP Energy") hereby certifies the following:

1.      BNPP Energy is a Delaware general partnership, comprised of partners BNP Paribas Energy Trading Holdings, Inc. (a Florida corporation) and BNP Paribas Energy Trading LLC (a Delaware limited liability company).  These general partners hold 100% of the ownership interests in BNPP Energy, and neither is publicly-traded.  Both general partners of BNPP Energy are indirect, wholly-owned subsidiaries of BNP Paribas, a publicly-held corporation with no parent, organized under the laws of France.  No publicly-held company owns 10 percent or more of BNP Paribas.

2      Insofar as it is relevant to this litigation, BNPP Energy purchases natural gas from all of the major supply regions in the United States and Canada and markets that gas throughout the United States wherever transportation service on pipelines is available.  BNPP Energy is a firm storage customer and shipper on the system of Transcontinental Gas Pipe Line Corporation ("Transco").

# **TABLE OF CONTENTS**

CERTIFICATE OF COUNSEL AS TO PARTIES, RULINGS AND RELATED CASES ........................................................................................ i

CORPORATE DISCLOSURE STATEMENT ...................................... iv

TABLE OF CONTENTS ......................................................................... v

TABLE OF AUTHORITIES .............................................................. vii

GLOSSARY ............................................................................................ x

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW................2

PERTINENT STATUTES AND REGULATIONS .................................2

STATEMENT OF THE CASE.................................................................2

   I.   Regulatory Background.................................................................2

   II.  Statement of the Facts..................................................................4

   III. Course of Proceedings And Disposition Below .........................6

SUMMARY OF ARGUMENT .............................................................11

STANDING ...........................................................................................14

STANDARD OF REVIEW ...................................................................15

ARGUMENT .........................................................................................16

   1.   The Commission Fails to Provide a Clear and Understandable Basis for Its Decision to Reverse the ALJ's Finding that the Transco's Incremental Cost Allocation Proposal is Contrary to the Commission's Cost Causation Principles.......................................................................20

A.    The Commission Failed to Reconcile its Approval of Transco's Past Practice of Rolling in the Costs of Base Gas Additions With Transco's Direct Assignment Approach Approved Here……………………………..22

B.    The Commission Improperly Relied Upon its "Foundation Shipper" Policy to Justify the Discriminatory Rate Treatment of BNPP Energy…....25

C.    The Commission Fails to Reconcile its Direct Allocation Approach With its Contrary Policy for Allocating the Cost Responsibility for Network Upgrade Costs……………………………………………………………...28

2.    The Commission Fails to Address and Reconcile Unrebutted Evidence that the Replenished Base Gas Volumes Support the Entitlements of the Historical Customers and that Transco's Allocation Proposal Forces BNPP Energy and South Jersey to Subsidize the Service of the Remaining Historical WSS-OA Customers........................................................................................................33

CONCLUSION ...........................................................................................................36

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

APPENDIX

# TABLE OF AUTHORITIES[1]

## COURT CASES

*United Distribution Companies v. FERC*, 88 F.3d 1105, 1159-61 (D.C. Cir. 1996), *cert. denied*, 117 S. Ct. 1723 (1997) .................................................................. 6

*Consolidated Edison Company of New York, Inc., et. al. v FERC*, 165 F.3d 992, 995 n. 2 (D.C. Cir. 1999) ................................................................................ 12

*Columbia Gas Transmission Corp. v. FERC,* 628 F.2d 578, 593 (D.C. Cir. 1987) .... 15

*SEC v. Chenery Corp.*, 332 U.S. 194, 196-97, *reh'g denied*, 332 U.S. 783 (1947) .... 15

*Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001 ..................................................................................................................... 16

*Consumers Union of United States, Inc. v. Consumer Prod. Safety Comm'n,* 491 F.2d 810, 812 (2nd Cir. 1974) ............................................................................. 16

*Morall v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005) .................................................. 16

*ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995) ................................ 16

*HC&D Moving & Storage Company v. United States*, 298 F. Supp. 746, 751 (D. Hawaii 1969). .................................................................................................... 31

*Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 686 (D.C. Cir. 2000) ................................................................................................................. 32

*Panhandle Eastern Pipe Line Co. v. FERC*, 881 F.2d 1101 (D.C. Cir. 1989) ............ 35

*East Tennessee Natural Gas Co. v. FERC*, 953 F.2d 675, 681 (D.C. Cir. 1992) ........ 35

---

[1] Authorities upon which BNPP Energy chiefly relies are marked with an asterisk.

## ADMINISTRATIVE DECISIONS AND ORDERS

*Transcontinental Gas Pipe Line Corp.*, 125 FERC ¶ 63,020
 (2008).............................................................1, 4, 11, 17, 18, 20, 22, 26, 33, 34

*Transcontinental Gas Pipe Line Corp.*, 130 FERC ¶ 61,043 ( 2010) (Opinion No.
 507) ..................................................................................................................1

*Transcontinental Gas Pipe Line Corp.*, 139 FERC ¶ 61,002 (2012) (Opinion No.
 507-A).......................................................................1, 11, 20, 22, 23, 24, 26, 27

*Transcontinental Gas Pipe Line Corp.*, 53 FPC 628 (1975) ........................................5

*Transcontinental Gas Pipe Line Corp.*, 12 FERC ¶ 61,287 (1980). ............................5

*Transcontinental Gas Pipe Line Corp.,* 85 FERC ¶ 61,119 (1998), *reh'g*,
 87 FERC ¶ 61,184 (1999)...............................................................................5

*Transcontinental Gas Pipe Line Corp.*, 116 FERC ¶ 61,314 (2006) ..........................10

*Transcontinental Gas Pipe Line Corp.*, 122 FERC ¶ 61,213 (2008) (*partial dissent
 by Commissioner Kelly*)..................................................................................10

*Transcontinental Gas Pipe Line Corp.*, 87 FERC ¶ 61,184 (1999) .....................23, 25

*Revisions to the Blanket Certificate Regulations and Clarification Regarding
 Rates*, FERC Stats. and Regs. ¶ 32,606 (2006) .................................................26

*Revisions to the Blanket Certificate Regulations and Clarification Regarding
 Rates,* FERC Stats. & Regs. ¶ 31,231 (2006) (Order No. 686)...................25, 26

*Reliant Energy Choctaw County, LLC v. Entergy Services, Inc.*, 107 FERC ¶
 61,141 (2004)..................................................................................................29

*Standardization of Generator Interconnection Agreement and Procedures*, FERC
 Stats. & Regs. ¶ 31,160 (2004) (Order No. 2003-A), *reh'g*, FERC Stats. &
 Regs. ¶ 31,171 (2004) (Order No. 2003-B), *reh'g*, FERC Stats. & Regs. ¶
 31,190 (2005) (Order No. 2003-C)...................................................................30

*PJM Interconnection, L.L.C.*, 138 FERC ¶ 61,230 (2012), *reh'g pending* ................32

*New Dominion Energy Cooperative and Old Dominion Electric Cooperative*, 122 FERC ¶ 61,174 (2008) ...................................................................................32

## STATUTES AND REGULATIONS

Natural Gas Act, 15 U.S.C §§ 717, *et seq.*..................................................................2

Section 2, 15 U.S.C § 717a(6) .............................................................................4

*Section 4, 15 U.S.C § 717c..................................................................1, 3

Section 7(c), 15 U.S.C § 717f(c) ........................................................................5

Section 19(a), 15 U.S.C § 717r(a) .....................................................................1

Section 19(b), 15 U.S.C § 717r(b) .....................................................................1

## ADMINISTRATIVE REGULATIONS

18 C.F.R. §§ 284, *et seq.* ...................................................................................4

# **GLOSSARY**

| | |
|---|---|
| ALJ | Administrative Law Judge |
| BNPP Energy | BNP Paribas Energy Trading GP |
| Commission or FERC | Federal Energy Regulatory Commission |
| Dth | Dekatherm |
| Fortis | Fortis Energy Marketing & Trading GP |
| NGA | Natural Gas Act, 15 U.S.C. § 717 *et seq.* |
| PSEG | PSEG Energy Resources & Trade LLC |
| SJGC | South Jersey Gas Company |
| South Jersey | South Jersey Resources Group, LLC |
| Transco | Transcontinental Gas Pipe Line Corporation |
| WSS | Washington Storage Service |
| WSS-OA | Washington Storage Service - Open Access |

## STATEMENT OF JURISDICTION

The Commission had subject matter jurisdiction under Section 4 of the Natural Gas Act, 15 U.S.C. § 717c.  This Court has jurisdiction under Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b).

After presiding over an evidentiary hearing, one of the Commission's Administrative Law Judges ("ALJ") issued an order finding that certain aspects of Transco's Docket No. RP06-569 general NGA Section 4 rate application were unjust, unreasonable, and unduly discriminatory.  "Initial Decision," *Transcontinental Gas Pipe Line Corp.*, 125 FERC ¶ 63,020 (November 21, 2008).

On January 21, 2010, the Commission issued Opinion No. 507, reversing the Initial Decision.  "Order on Initial Decision," *Transcontinental Gas Pipe Line Corp.*, 130 FERC ¶ 61,043 (January 21, 2010).

On February 22, 2010, BNPP Energy, jointly with South Jersey Resources Group, LLC ("South Jersey"), timely petitioned for rehearing under Section 19(a) of the Natural Gas Act, 15 U.S.C. § 717r(a), and the Commission issued its order on rehearing, Opinion No. 507-A, on April 2, 2010.  "Order on Rehearing," *Transcontinental Gas Pipe Line Corp.*, 139 FERC ¶ 61,002 (April 2, 2012).

Both the Order on Initial Decision and Order on Rehearing are final with regard to Transco's proposal to impose selectively a higher, specially-denominated

rate upon BNPP Energy.  BNPP Energy filed a timely petition for review in this

Court on June 1, 2012.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether the Respondent Federal Energy Regulatory Commission's decision

to reverse the findings of its own Administrative Law Judge and approve

Transcontinental Gas Pipe Line Corporation's unjust, unreasonable, and

unlawfully discriminatory proposal to impose selectively upon Petitioner BNP

Paribas Energy Trading GP (*f/k/a* Fortis Energy Marketing & Trading GP) higher,

customer-specific rates for standard WSS-OA service, is consistent with

Commission policy and precedent, is supported by substantial evidence developed

in the record, is neither arbitrary nor capricious, and is the product of reasoned

decision-making?

## PERTINENT STATUTES AND REGULATIONS

Pertinent Statutes and Regulations are set forth in the attached Appendix,

Addendum of Statutes and Regulations.

## STATEMENT OF THE CASE

### I.  REGULATORY BACKGROUND

The Commission regulates the rates and services of interstate natural gas

pipelines pursuant to the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717, *et seq.*

Under Section 4 of the NGA, the Commission is charged with ensuring that any

rate charged by an interstate natural gas company is "just and reasonable," 15

U.S.C. § 717c(a).  Section 4 of the NGA also requires the Commission to ensure

that such pipelines do not "make or grant any undue preference or advantage … or

maintain any unreasonable difference in rates [or] charges …," 15 U.S.C. §

717c(b).

   At issue in this proceeding is a single aspect of an application filed by

Transco seeking a general increase to its rates.  In that rate application (docketed

by the Commission in Docket No. RP06-569), Transco proposed to modify the

rates for one of its open-access storage services – the Washington Storage Service

("WSS-OA") – by creating two customer-specific rates, one applicable to BNPP

Energy's predecessor, Cinergy Marketing & Trading, LP ("Cinergy")[1] and the

other applicable to South Jersey Resources Group LLC ("South Jersey").  Transco

denominated these two customer-specific rates as "Incremental Rates."[2]  The

specific storage rates for BNPP Energy and South Jersey are multiples of the rate

applicable to the twenty-eight (28) historical WSS-OA storage customers.

---

[1]  In the fall of 2006, Cinergy was acquired by Fortis Energy Marketing & Trading,
GP.  Fortis Energy Marketing & Trading GP subsequently changed its name on
January 10, 2010 to BNP Paribas Energy Trading GP.
[2]  Transcontinental Gas Pipe Line Corporation FERC Gas Tariff, Third Revised
Volume No. 1, Eighteenth Revised Sheet No. 27A.

BNPP Energy and South Jersey challenged these discriminatory storage rates.  At the conclusion of an evidentiary hearing, the Presiding Administrative Law Judge ("ALJ") issued an Initial Decision on November 21, 2008, determining that the rates were unlawful.  In Opinion No. 507, however, the Commission reversed its own ALJ's Initial Decision and approved Transco's "incremental" rate proposal.  The Commission then upheld Opinion No. 507 on rehearing.

BNPP Energy seeks review of the Commission's determination in Opinion Nos. 507 and 507-A.

## II.   STATEMENT OF THE FACTS

Transco owns and operates a large multi-state natural gas pipeline and is a jurisdictional "natural gas company" under Section 2 of the NGA, 15 U.S.C. 717a(6), subject to the Commission's regulation.  Transco's pipeline facilities extend from supply areas in Texas, Louisiana, and Mississippi to their termination in the New York City metropolitan area.

Transco offers various jurisdictional services, including transportation and storage services under the Commission's Part 284 "Open Access" regulations.[3] For the purposes of this proceeding, Transco provides open-access storage services from various storage facilities on its system, including "Washington Storage Service – Open Access" under Rate Schedule WSS-Open Access ("WSS-OA").

---

[3]  18 C.F.R. §§ 284, *et seq.*

Transco furnishes WSS-OA from storage caverns and appurtenant facilities in the Washington Storage Field, which is located in St. Landry County, Louisiana, in "Zone 3" of Transco's pipeline system.

Transco, with the support of a number of its sales customers, developed the Washington Storage Field and the associated Washington Storage Service ("WSS") in the mid-seventies during a period of supply constraints.  By an order issued February 26, 1975, the Commission's predecessor, the Federal Power Commission, approved the WSS as an individually-certificated storage service under Section 7(c) of the NGA, 15 U.S.C. § 717f(c).[4]  Since Transco first placed the Washington Storage Field into service, it expanded the capacity of the facility several times.  In 1981, the Commission authorized Transco's final expansion to 75,000,000 Mcf of total storage capacity.[5]

After the Commission adopted its open-access regulatory framework, Transco filed to convert WSS to an open-access rate schedule, WSS-OA.  The Commission approved this conversion effective November 1, 1998.[6]  Nearly all of Transco's historical WSS customers have converted their service to the WSS-OA rate schedule.

---

[4]  *Transcontinental Gas Pipe Line Corp.*, 53 FPC 628 (1975).

[5]  *Transcontinental Gas Pipe Line Corp.,* 12 FERC ¶ 61,287 (1980).

[6]  *Transcontinental Gas Pipe Line Corp.,* 85 FERC ¶ 61,119 (1998), *reh'g*, 87 FERC ¶ 61,184 (1999).

### III.    COURSE OF PROCEEDINGS AND DISPOSITION BELOW

BNPP Energy is a WSS-OA storage customer.  Its predecessor, Cinergy,

acquired WSS-OA storage capacity on March 31, 2005 *via* a permanent capacity

release from one of the "historical" WSS customers, PSEG Energy Resources &

Trade LLC ("PSEG").[7]  Under the terms of Transco's tariff and the WSS-OA

service agreement, Cinergy was obligated to pay, and immediately began paying,

Transco's then-effective maximum WSS-OA rate,[8] and it executed a service

agreement ratifying that obligation.

As a replacement storage customer for PSEG's capacity, BNPP Energy

"stepped into the shoes" of PSEG under the Commission's capacity release rules,

and thus began taking WSS-OA service on the same – indeed, on an identical –

basis as had PSEG.[9]

On August 31, 2006, seventeen months *after* BNPP Energy's predecessor

Cinergy became a WSS-OA customer, Transco made a filing seeking a general

increase to its rates under Section 4 of the NGA.  In the filing, which the

---

[7]  South Jersey acquired its capacity *via* permanent release from South Jersey Gas
Company effective May 1, 2006.

[8]  At the time BNPP Energy became a WSS-OA customer, Transco's maximum
daily firm demand charge was 1.86¢, and its daily firm Storage Capacity Quantity
Charge was 0.02¢.  Seventeenth Revised Sheet No. 27A.

[9]  The Court reviewed and affirmed the Commission's capacity release regulations
as part of FERC's transition to an open access transportation regime.  *United
Distribution Companies v. FERC*, 88 F.3d 1105, 1159-61 (D.C. Cir. 1996), *cert.
denied*, 117 S. Ct. 1723 (1997).

Commission docketed as Docket No. RP06-569, Transco proposed to single out

Cinergy and another customer, South Jersey, from the population of WSS-OA

storage customers and impose upon each its own specific storage rate.

As shown in the "redline" tariff sheet reproduction below,[10] the generally-

applicable, system-wide rolled-in WSS-OA rates BNPP Energy had been paying

were increased somewhat as a consequence of the overall increase in Transco's

proposed cost-of-service.  But the newly-proposed "incremental" rates proposed

for BNPP Energy were nearly three times the generally-applicable WSS-OA firm

rates applicable to every other WSS-OA customer.[11]  At the hearing, BNPP and

South Jersey estimated that collectively they would pay $2.5 million more in

annual storage fees under Transco's proposal than they would under a fully-rolled

in allocation methodology.[12]

---

[10]  The new tariff language is shown in red; the superseded rates are depicted as
strike-outs.

[11]  Transcontinental Gas Pipe Line Corporation FERC Gas Tariff, Third Revised
Volume No. 1, Eighteenth Revised Sheet No. 27A.  The rates proposed for South
Jersey were more than four times the generally-applicable WSS-OA rate.

[12]  Exhibit FS-5.

**Rate Schedule and Section**

| | Maximum Daily Rate (dt) ($) | Minimum Daily Rate (dt) ($) |
|---|---|---|
| **WSS-Open Access – Washington Storage Service** | | |
| 3.2 (a)   Demand Charge | ~~0.0186~~ **0.02231** | 0.00000 |
| 3.2 (b)   Storage Capacity Quantity Charge | ~~0.0002~~ **0.00026** | 0.00000 |
| 3.2 (c)   Quantity Injected Charge | ~~0.0064~~ **0.01176** | ~~0.0064~~ **0.01176** |
| 3.2 (d)   Quantity Injected Charge | ~~0.0064~~ **0.01176** | ~~0.0064~~ **0.01176** |
| | | |
| **Incremental Rates** | | |
| **Cinergy Marketing & Trading LP** | | |
| **3.2 (a)   Demand Charge** | **0.06274** | **0.00000** |
| **3.2 (b)   Storage Capacity Quantity Charge** | **0.00074** | **0.00000** |
| **3.2 (c)   Quantity Injected Charge** | **0.01176** | **0.01176** |
| **3.2 (d)   Quantity Injected Charge** | **0.01176** | **0.01176** |
| | | |
| **South Jersey Resources Group LLC** | | |
| **3.2 (a)   Demand Charge** | **0.08940** | **0.00000** |
| **3.2 (b)   Storage Capacity Quantity Charge** | **0.00105** | **0.00000** |
| **3.2 (c)   Quantity Injected Charge** | **0.01176** | **0.01176** |
| **3.2 (d)   Quantity Injected Charge** | **0.01176** | **0.01176** |

BNPP Energy (and South Jersey) continued to pay Transco's generally-applicable rolled-in WSS-OA rate until March 1, 2007, the date Transco's Docket No. RP06-569 rate increase filing became effective, subject to refund.  Since that date, BNPP Energy has paid the higher, customer-specific "incremental" rates on a subject-to-refund basis.

In its rate application, Transco claimed these higher customer-specific rates were the result of PSEG and SJGC's purchases and withdrawal of certain base gas

volumes from the Washington Storage Field.  Base gas is a volume of gas that

remains in the storage facility and is used to support the facility's pressure and

ability of the storage operator to deliver "top gas" (gas volumes which each storage

customer injects, stores, and later withdraws).  Transco treats the base gas volumes

volumes in the Washington Storage Facility as a rate base item used in calculating

the WSS-OA rates, except that base gas does not depreciate like storage plant, and

so Transco includes in rates only its return on equity and taxes applied to its

aggregate base gas purchase balances.

Under Section 8.2 of Transco's Rate Schedule WSS-OA, certain historical

WSS-OA customers are granted an option to purchase and withdraw a defined

quantity of base gas from Transco's Washington Storage facility when terminating

or permanently releasing their storage capacity.  After PSEG and SJGC each

exercised its base gas purchase right and withdrew their respective base gas

quantities, Transco purchased replacement base gas at what Transco claimed were

the then-current market prices.[13]  As noted, Transco then allocated 100% of those

costs to BNPP Energy and South Jersey, creating a new "incremental" WSS-OA

---

[13]  According to Transco's prefiled testimony, following PSEG's base gas
purchase, Transco made three replenishment purchases in April of 2006, and
attributed 1,607,573 Dth with a recorded value of $10,683,679 to BNPP Energy.
With regard to the SJGC purchase and withdrawal, Transco made two additional
base gas replenishment purchases in late 2006, totaling 1,710,950 Dth, and

rate for each that included a return and tax component that was based upon the

actual price paid for this replacement base gas.  This cost allocation methodology

greatly increased the storage demand charges applicable to BNPP Energy and

South Jersey alone, while the demand charges of all remaining WSS-OA customers

remained much lower, as they continued to reflect costs of base gas purchased by

Transco in the past at a far-lower average acquisition cost.

      After considering numerous protests and comments, the Commission issued

an order on September 29, 2006 accepting and suspending Transco's rate filing

until March 1, 2007, subject to refund and the outcome of an evidentiary hearing.[14]

      Following discovery and settlement negotiations, the participants achieved a

partial settlement of the rate case, resolving most issued in the case, but reserving

for litigation issues associated with the justness and reasonableness of Transco's

proposal to impose "incremental" rates on BNPP Energy and South Jersey.  The

Commission approved this partial settlement by Letter Order dated March 7,

2008.[15]

---

attributed this entire volume to South Jersey at a cost of $9,796,634.  Exhibit T-2, page 1 of 5.

[14] *Transcontinental Gas Pipe Line Corp.*, 116 FERC ¶ 61,314 (2006).

[15] *Transcontinental Gas Pipe Line Corp.*, 122 FERC ¶ 61,213 (2008) (*partial dissent by Commissioner Kelly*).

After conducting the requisite evidentiary hearing on Transco's "incremental" rate proposal for WSS-OA service, the ALJ issued an Initial Decision (i) rejecting, as unlawful, Transco's proposal to impose incremental WSS-OA rates upon BNPP Energy and South Jersey, and (ii) denying BNPP Energy and South Jersey's challenge to the Section 8.2 base gas purchase provision of Transco's Rate Schedule WSS-OA.[16]

Fourteen months after the ALJ issued his Initial Decision, the Commission issued Opinion No. 507, reversing the portion of the ALJ's decision finding Transco's incremental rate proposal to be unlawful, and, in Opinion No. 507-A, upheld that order on rehearing.

BNPP Energy now seeks review of these two Commission decisions.

## SUMMARY OF ARGUMENT

Although Transco denominated the rates at issue in this proceeding "incremental" rates, this proceeding does not involve a challenge to incremental rates in the context they are traditionally understood.

> "Incremental" pricing refers to a cost-recovery method in which the constructing pipeline develops a separate cost of service for the expansion facilities, recapturing the construction cost solely from the particular customers who utilize them. *See TransCanada Pipelines Ltd. v. FERC*, 306 U.S. App. D.C. 299, 24 F.3d 305, 307 n.1 (D.C. Cir. 1994). Under "rolled-in" pricing, the primary alternative to

---

[16]  The Commission never ruled on the merits of BNPP Energy and South Jersey's challenge to Section 8.2, finding, instead, that the issue was outside the scope of the evidentiary hearing.  BNPP Energy is not seeking review of that issue here.

incremental treatment, the pipeline adds the costs of the expansion facilities to its total rate base, recovering its expenditures by increasing the general rate that all customers pay in proportion to their reservation of capacity or direct usage.  *See Algonquin Gas Transmission Co. v. FERC*, 292 U.S. App. D.C. 197, 948 F.2d 1305, 1308 & n.1 (D.C. Cir. 1991).[17]

Instead, no expansion facilities are involved in this proceeding, and the issue for this Court is how the costs associated with 3.4 million dekatherms of base gas purchased by Transco and injected into its Washington Storage facility should be allocated among, and reflected in the rates charged to, Transco's thirty-one (31) WSS-OA storage customers.  In the past, Transco has had only one generally-applicable WSS-OA rate, and it has always "rolled-in" the costs of its base gas purchases into that generally-applicable rate, so that the purchases of higher-priced base gas had the effect of raising the rate paid by all storage customers equally.

In this proceeding, however, Transco departed for the first time from this rate-making practice by allocating 100% of the costs of its recent base gas purchases to two specific storage customers: BNPP Energy and South Jersey.  In the evidentiary hearing, BNPP Energy and South Jersey challenged the resulting customer-specific rates as unjust, unreasonable and unduly discriminatory.

---

[17]  *Consolidated Edison Company of New York, Inc., et. al. v FERC*, 165 F.3d 992, 995 n. 2 (D.C. Cir. 1999).

The ALJ, after conducting an evidentiary hearing, found that, based on the fact that Transco's base gas was for the equal benefit of all Transco's WSS-OA customers, the costs of these recent base gas purchases should continue to be rolled-in with the existing book costs of Transco's base gas inventory, and thus all WSS-OA customers should pay the same rate. In light of this record evidence, the ALJ concluded that Transco's contrary proposal to allocate 100% of these costs to BNPP Energy and South Jersey was unjust and unreasonable, as well as unduly discriminatory because BNPP Energy and South Jersey were forced to pay much higher rates for the same storage service. The ALJ specifically rejected contentions by the historical storage customers that they were entitled to rate protection by virtue of their status as historical customers.

Despite the ALJ's well-reasoned and factually supported findings and conclusions, the Commission reversed the Initial Decision, holding, instead, that "incremental" rates for BNPP Energy and South Jersey were just and reasonable and not unduly discriminatory.

As explained in detail below, the Commission committed a number of significant errors in reversing its own ALJ and approving the special incremental WSS-OA rate for BNPP Energy. Specifically, the Commission:

1. Failed to reconcile Transco's consistent and unbroken past practice of rolling in the costs of higher-priced base gas purchases with Transco's

13

unprecedented proposal in this proceeding to allocate base gas purchase costs to specific customers.

2.      Improperly relied on an inapt "foundation shipper" analysis to justify different rates for the same WSS-OA service, when Transco met none of the Commission's announced prerequisites for approval of differentiated rates.

3.      Failed to address contrary Commission policy regarding proper cost recovery for network upgrade costs.

4.      Failed to reconcile its decision to allocate 100% of base gas purchase costs to two WSS-OA customers, when the uncontroverted facts developed in the hearing demonstrated (i) that the base gas purchase costs in question benefitted both BNPP Energy, South Jersey, and all of the historical WSS-OA customers collectively, and, therefore, (ii) that Transco's unfair proposal results in a subsidy by BNPP Energy and South Jersey of the remaining WSS-OA customers.

## STANDING

BNPP Energy has standing based on its status as a WSS-OA customer upon whom Transco has imposed a special, customer-specific rate that is significantly higher than the generally-applicable WSS-OA rate.  By failing to reject this rate, the Commission's Orders have caused injury-in-fact to BNPP Energy by allowing Transco to continue collecting this higher rate from BNPP Energy, even though

14

BNPP Energy otherwise receives the same kind and quality of storage service as all other WSS-OA customers.

Since Transco is collecting this rate subject to refund, a favorable ruling here could provide redress for this injury-in-fact by leading to refunds for past overpayments by BNPP Energy and, prospectively, by requiring Transco to bill all WSS-OA customers under a single, universally-applicable WSS-OA rate.

## STANDARD OF REVIEW

A reviewing court cannot and should not accept an agency determination unless it is the result of reasoned and principled decisionmaking that can be ascertained from the record.[18]  The Supreme Court has stated that "to meet the requirement of reasoned decisionmaking, the agency must set forth the basis of the decision with such clarity as to be understandable."[19]

Further, this court has recognized that, "at a minimum, [the arbitrary, capricious, and abuse of discretion] standard requires the agency to 'examine the relevant data and articulate a satisfactory explanation of its action including a

---

[18]  *Columbia Gas Transmission Corp. v. FERC,* 628 F.2d 578, 593 (D.C. Cir. 1987).

[19]  *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97, *reh'g denied*, 332 U.S. 783 (1947).

'rational connection between the facts and the choice made.'"[20]   Likewise, an

agency "must not ignore evidence placed before it by interested parties."[21]

"[W]here an agency departs from established precedent without explanation, its

decision will be vacated as arbitrary and capricious."[22]

As explained in detail below, the Commission's Orders fail to meet these

standards.

## ARGUMENT

The ALJ found, after careful consideration of the evidence presented at

hearing regarding the actual, unitary operational characteristics of Transco's WSS

storage facility, that Transco's proposal to allocate selectively 100% of Transco's

base gas purchase costs to BNPP Energy (referred to in the Initial Decision as

"Fortis") (and South Jersey) is unjust and unreasonable and unduly discriminatory

based upon the Commission's longstanding cost-causation principles.  The ALJ

specifically found that:

---

[20]  *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001)*, citing*, *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, (1962)).

[21]  *Consumers Union of United States, Inc. v. Consumer Prod. Safety Comm'n*, 491 F.2d 810, 812 (2nd Cir. 1974)*, citing, Scenic Hudson Preservation Conference v. FPC*, 453 F.2d 463 (2nd Cir. 1971), *cert. denied*, 407 U.S. 926 (1972).  *See also, Morall v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005) (finding that an agency's decision did "not withstand review because the agency decisionmaker *entirely ignored* relevant evidence").

[22]  *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995).

16

129.   Since all base gas as a whole serves the top gas capacity and deliverability needs of all customers as a whole, it is impossible to attribute any portion of base gas to any one or more customers in any way other than pro rata according to each customer's top gas volume. Other than by its volumetric size relative to others, no one customer's top gas allotment can be said to "cause" more base gas cost than any other customer's.  All base gas that is added to the Field contributes to the pressure that is necessary to push all top gas out of the Field. Removing base gas reduces that pressure and diminishes the deliverability of all top gas in the Field.

130.   Since no WSS/WSS-OA customer imposes any more burden or draws any more benefit from base gas than any other customer, the principle of cost causation does not support the imposition of an incremental price on new customers based solely on the injection or withdrawal of any given quantity of base gas.  When base gas is injected or withdrawn, the top gas capacity and deliverability needs of all customers are affected equally.  Thus, when PSEG and South Jersey Gas withdrew their base gas option entitlements and Transco replenished that base gas with new volumes, Transco did so in order to support the top gas capacity and deliverability needs of all of its customers, not just those of Fortis and South Jersey.  *All* service was degraded by the base gas withdrawal, and *all* service was restored by its replenishment.[23]

In addition to determining that Transco's proposal to charge selectively

BNPP Energy and South Jersey an incremental rate was unjust and unreasonable,

the ALJ also concluded that, based on the record evidence developed in the

hearing:

[T]he incremental rates have no rational basis in a legitimate difference between Fortis [BNPP Energy] and South Jersey on the one

---

[23]  Initial Decision, 125 FERC ¶ 61,020 at PP 129-130 (*footnotes omitted*).

hand and all other customers on the other, and therefore are unlawfully discriminatory under NGA Section 4.[24]

Significantly, the ALJ continued on to consider, and specifically reject, the cost causation theory that Transco employed to justify its proposal to allocate 100% of the base gas costs to BNPP Energy and South Jersey:

> 131.   In the face of these straightforward facts, Transco and WSS Customer Group maintain that Fortis and South Jersey should pay "incremental" rates based on the full cost of the replenishment base gas, rather than lower rates based upon a roll-in of that cost with the historic[al] cost of all base gas in the Field, because the succession of Fortis and South Jersey to the delivery entitlements of former customers PSEG and South Jersey Gas caused the need for replenishment base gas, whereas the WSS service of all other customers did not change at all.  Essentially, Transco and WSS Customer Group are saying that the withdrawal of PSEG and South Jersey Gas from the Field and their replacement with Fortis and South Jersey were the proximate cause for Transco's purchase of the replenishment base gas—in short, "but for" those events, Transco would not have bought the replenishment base gas.

> 132.   "But for" arguments are appealing, but they tend to mask other impacts that come between the alleged proximate cause and the allegedly injurious effect.  Here, the allegation by Transco and WSS Customer Group of the proximate cause for the purchase of replenishment base gas glosses over a number of countervailing considerations.  For instance, it is inaccurate to suggest that, "but for" Fortis and South Jersey having stepped into the shoes of PSEG and South Jersey Gas, Transco would not have purchased replenishment base gas.  Doing so ignores the fact that when PSEG and South Jersey Jersey Gas left the Field and took their base gas option amounts with them, service to all customers remaining in the Field was degraded as a result.  As Staff points out under its own theory of the case, there is at least a measurable portion of the replenishment base gas purchased

---

[24] *Id.* at P 179.

by Transco that, even in the absence of Fortis and South Jersey, would have been necessary to inject into the Field anyway in order to restore the top gas capacity and deliverability needs of the remaining customers when PSEG and South Jersey Gas removed their base gas option entitlements. WSS Customer Group similarly admits that in the absence of the replenishment base gas, the remaining customers' WSS and WSS-OA service may have been diminished.

133.   Transco asserts that before purchasing replenishment base gas, it "would likely consult with its WSS/WSS-Open Access customers to determine whether they desired to maintain their existing service levels or whether they preferred to reduce their existing service levels to a level as low as the level supported by the remaining base gas." This assertion implies that Transco could have avoided at least some of the high costs of replenishment base gas when it replaced the PSEG and South Jersey Gas withdrawals if it had consulted with its remaining customers beforehand to see if they could live with a lower level of base gas service. Thus, Transco may not have needed to buy all of the replenishment base gas that it ended up buying just because of the arrival of Fortis and South Jersey on the scene. This, too, points away from Fortis and South Jersey as the sole "cause" of the replenishment base gas purchase.

* * *

Transco's practice of rolling-in base gas replenishment costs is the longstanding practice and nothing in the Tariff up to now prohibited Transco from doing so. Having Fortis and South Jersey replace PSEG and South Jersey Gas allows Transco to roll the costs of replenishment base gas into their rates too, not just the rates of the remaining historic[al] customers, which benefits the historic[al] customers by reducing their otherwise higher costs.

138.   These considerations suggest that Transco's replenishment base gas purchase was as crucial to meeting the needs of its existing customers as it was to meeting the needs of Fortis and South Jersey. With a little foresight, Transco could have readily avoided at least some of that cost. ***Therefore, it is cannot be said that the entire need need for the replenishment base gas, and the entire resulting cost,***

> *could have been avoided "but for" the addition of Fortis and South Jersey as customers.*[25]

As explained below, the Commission's Order on Rehearing is not sustainable because it is contrary to the ALJ's factual determinations and conclusions, is at odds with previous Commission orders upon which it purports to rely, and fails to acknowledge and distinguish policies that reach opposite results in the same factual situations.

**1.      *The Commission Fails to Provide a Clear and Understandable Basis for Its Decision to Reverse the ALJ's Finding that the Transco's Incremental Cost Allocation Proposal is Contrary to the Commission's Cost Causation Principles.***

In its Order on Rehearing, the Commission recognizes the ALJ's factual determination that, ". . .because Transco operates the Washington Storage Field on an integrated basis, all base gas injected into the field serves the top gas deliverability needs of all WSS/WSS-OA customers, regardless of when each shipper joined the system."[26]  But the Commission then goes on to state that, "[o]n the other hand, PSEG and South Jersey Gas' permanent releases of their capacity to Fortis and South Jersey were the 'most immediate and proximate' cause of Transco's need to purchase new base gas in 2005 and 2006."[27]

---

[25]  *Id.* at PP 131-138 (*emphasis added, footnotes omitted*).
[26]  Order on Rehearing at P 64
[27]  *Id.* at P 65.

The ALJ held that the actual function and use of base gas in a single, unitary storage facility – that is, the fact that all base gas supports all entitlements, irrespective of any storage customer's status as an original or replacement customer – precluded any effort to assign artificially discrete base gas purchases to specific storage customers.  The Commission, however, postulated that BNPP Energy and South Jersey's status and participation in WSS-OA as replacement storage customers is equally determinative of cost causation, so it purported to "weigh" the two "alternative analyses" to determine which one dictates the proper rate treatment of the bas gas purchase costs:

> 66.  Because these alternative analyses of cost causation are both factually accurate, the relative weight to be given to each in resolving the rolled-in versus incremental rate issue turns on equitable factors and other public interest considerations.[28]

However, none of the "equitable factors" or "public interest considerations" the Commission purported to examine and weigh under this newly-created "equity override" policy justified the Commission's decision to allocate 100% of Transco's base gas purchase costs to BNPP Energy and South Jersey.

---

[28]  *Id.* at P 66.

### A.  *The Commission Failed to Reconcile its Approval of Transco's Past Practice of Rolling in the Costs of Base Gas Additions With Transco's Direct Assignment Approach Approved Here.*

BNPP Energy and South Jersey pointed out, and the ALJ agreed, that Transco's proposal in this proceeding to allocate 100% of base gas purchase costs to two specific storage customers is directly contrary to its previous unbroken practice of rolling in the costs of every base gas addition, when, as in this proceeding, the roll-in of those costs increased the rates of historical storage customers whose entitlements were unchanged.  The ALJ further agreed with Fortis and South Jersey that it was unduly discriminatory for Transco to have supplied base gas additions for its historical customers and Fortis and South Jersey alike, yet discriminatorily charge only Fortis and South Jersey incremental rates.[29]

On rehearing, the Commission acknowledged that it had in fact approved as just and reasonable rolled-in rates for all of Transco's previous base gas additions:

> 57.  Fortis and South Jersey point out that Transco consistently rolled the cost of all historic[al] shippers' base gas contributions into its rate base for purposes of calculating its WSS rates, despite the fact the historic[al] shippers' later base gas contributions, particularly after 1979, cost substantially more than the earlier contributions.  Thus, for example, the September and October 1981 base gas purchases made in connection with the final 1981 expansion to provide additional capacity to Brooklyn Union, ConEd and Piedmont cost $2.8448 to $2.9887, while the pre-1980 base gas purchases generally cost significantly less than a dollar.[30]

---

[29]  Initial Decision at PP 137, 179,
[30]  Order on Rehearing at P 57.

Faced with this inconsistent treatment of customers, the Commission, for the first time in its Order on Rehearing, articulated a new "offsetting financial benefits" test emanating from the *1999 Conversion Order*,[31] which it used in an attempt to explain away the discriminatory rate treatment of BNPP Energy and South Jersey:

> 58.  * * *  Rolling in the cost of the base gas purchases made in connection with the 1979-1981 expansions was reasonable, because those expansions provided offsetting financial benefits to the historic[al] shippers who did not participate in them.  As the Commission explained in the *1999 Conversion Order,* each expansion increased top gas capacity by more than it increased the required volume of base gas.  As a result, the ratio of base gas to shipper capacity entitlements declined with each expansion.  This meant that each expansion caused WSS customers who did not increase their entitlements in that expansion to have "excess" base gas.  Therefore, after each expansion, the non-participating shippers were permitted to purchase and withdraw their excess base gas, pursuant to section 9.5 of the WSS Rate Schedule.  Base gas withdrawn and sold to the non-participating customers offset exactly the volumes of the new base gas injected by the new expansion customers.  The *1999 Conversion Order* also specifically found that at the time of the 1981 expansion, when Brooklyn Union, ConEd, and Piedmont contributed additional base gas at prices in excess of $2.84, the non-participating historic[al] shippers were sold excess base volumes at their original cost. Thus, the 1981 expansion provided all the non-participating shippers the benefit of obtaining significant volumes of gas at prices that were one-third or less of the then prevailing market price.

> 59.  By contrast, the base gas purchases Transco made in 2005 and 2006 in order to maintain its existing top gas storage capacity so that it could serve Fortis and South Jersey provided no financial benefit to the historic[al] shippers.  Unlike the earlier situations when new base gas was purchased as part of an expansion, Transco's base gas purchases to serve Fortis and South

---

[31]  *Transcontinental Gas Pipe Line Corp.*, 87 FERC ¶ 61,184 (1999) ("*1999 Conversion Order*").

Jersey did not enable the historic[al] shippers remaining on the system to purchase any of the base gas they had previously contributed.  All of the base gas contributed by those shippers continued to be necessary to maintain the capacity of the field.[32]

The Commission's "offsetting financial benefits" test is a result-driven fabrication that appears, for the first time, in the Order on Rehearing.  This new test does not discharge the Commission's obligation to engage in reasoned-decision-making.

First, the Commission conceded that the *1999 Conversion Order* did not address the proper allocation of costs of base gas purchases:

> 88.  Fortis and South Jersey are correct that the *1999 Conversion Order* did not address the cost allocation methodology for replenishment of base gas.[33]

If, as the Commission concedes, the *1999 Conversion Order* did not address the allocation of costs, then the Commission cannot rationally rely upon it to justify any cost allocation methodology, much less to justify a new cost allocation methodology for BNPP Energy that is contrary to its previous consistent holdings that the costs of Transco's base gas additions were to be allocated to all storage customers equally and recovered in rolled-in rates.

Second, the Commission's "financial benefits test" is directly contrary to the Commission's own words explaining that historical storage customers were

---

[32]  Order on Rehearing at PP 58-59 (*internal citations omitted*).

[33]  *Id.* at P 88.

allowed to purchase "excess" base gas for the express reason of balancing their gas

purchase entitlement levels with the new (lower) system-wide base gas-to-top-gas

ratio occasioned by Transco's serial expansions of the Washington Storage Field:

> Consistent with Sections 9.1 and 9.5 of the WSS rate schedule, as
> discussed below, the expansion customers provided additional base
> gas to support these increased entitlements, and the remaining
> customers that did not increase their top gas capacity entitlements
> were sold excess base gas volumes. ***This was done to bring all Rate
> Schedule WSS customers in to line with the new 0.3883/1 ratio.***[34]

Nowhere in this order does the Commission state the sales of "excess" base

gas to non-expansion customers was the offsetting *quid pro quo* for the higher

rolled-in rates that resulted from those base volume additions.  Indeed, the fact that

Transco repeatedly rolled-in higher base gas purchase costs in its WSS rates

demonstrates that the historical storage customers had no expectation that they

would be insulated from the rate impact of these purchase costs.

For these two reasons alone, the Commission's belated reliance on a

"financial benefits" test fails.

**B.    *The Commission Improperly Relied Upon its "Foundation Shipper"
Policy to Justify the Discriminatory Rate Treatment of BNPP Energy.***

In addition to determining that Transco's proposal to charge selectively

Fortis and South Jersey customer-specific rates is unjust and unreasonable, the ALJ

---

[34]  *1999 Conversion Order*, 87 FERC ¶ 61,184 at p. 61,706.

concluded that, based on the record evidence developed in the hearing, this

proposal was "unlawfully discriminatory" too:

> [T]he incremental rates have no rational basis in a legitimate
> difference between Fortis and South Jersey on the one hand and all
> other customers on the other, and therefore are unlawfully
> discriminatory under NGA Section 4.[35]

In its Order on Rehearing, the Commission attempted to justify the disparate

rate treatment of BNPP Energy and South by citing to Order No. 686, a rulemaking

in which the Commission clarified various aspects of construction authority under

its Subpart F blanket certificate regulations.[36]  The Commission claimed that the

"foundation shipper" policies discussed in Order No. 686 support forcing BNPP

Energy (and South Jersey) to bear 100% of replenished base gas costs on an

incremental basis, while permitting the remaining historical shippers to enjoy the

benefit of rolled in rate treatment of past base gas costs:

> 66.    * * *  The Commission has a policy of permitting rate
> differentials between "foundation" shippers who commit to purchase
> capacity on a new project before it is built and shippers that sign up
> for service later.[37]  The Commission explained that such rate

---

[35]  Initial Decision at P 179.

[36]  *Revisions to the Blanket Certificate Regulations and Clarification Regarding
Rates*, FERC Stats. and Regs. ¶ 32,606, at P 98 (2006); *Revisions to the Blanket
Certificate Regulations and Clarification Regarding Rates,* Order No. 686, FERC
Stats. & Regs. ¶ 31,231 (2006).

[37]  *Revisions to the Blanket Certificate Regulations and Clarification Regarding
Rates*, FERC Stats. and Regs. ¶ 32,606, at P 98 (2006); *Revisions to the Blanket
Certificate Regulations and Clarification Regarding Rates,* Order No. 686, FERC
Stats. & Regs. ¶ 31,231, at P 65-70 (2006).

differentials may be justified, because "the contractual commitments by the foundation shippers to purchase capacity on the new projects provide essential support for the sponsor to proceed with the project."[38]  Transco's proposed incremental treatment of the base gas costs at issue in this case is consistent with this policy.[39]

This Rulemaking, issued more than 30 years after Transco established its Washington Storage Service and, in fact, ***after*** Transco filed its incremental rate proposal in the proceedings below, does not support the Commission's decision to reverse its ALJ's findings that Transco's incremental rate proposal is unjust, unreasonable, and unduly discriminatory.

The Commission does not explain how Transco's original WSS rate offerings comport with the rate policies discussed in Order No. 686.  When it filed for a certificate of public convenience and necessity to provide WSS in the mid-seventies, Transco never offered lower "foundation shipper" rates and higher "incremental shipper" rates to potential participants in the Washington Storage Field project, much less made those rate options generally available in an public open season as required under the Commission's "foundation shipper" policy.  Nor did Transco ever offer the original WSS customers a rate option that insulated them from the costs of future base gas purchases.

---

[38]  FERC Stats. & Regs. ¶ 32,606 at P 98 (2006),
[39]  Order on Rehearing at P 66.

27

As the ALJ recognized, the fact that historical customers negotiated for themselves a right to withdraw base gas from Transco's system at a below-market rate does not justify further penalizing BNPP Energy and South with a much higher incremental rate:

> 171.  . . .  Fortis and South Jersey are at a competitive disadvantage to to the historic[al] customers in that they do not enjoy the right they own of being able to purchase base gas at historic[al] cost.  This disadvantage does not justify making Fortis and South Jersey even worse off compared to historic[al] customers by unfavorable differential rate treatment.[40]

The base gas purchase provision bears no relationship to the proper allocation of the cost of base gas.  As such, the Commission's reliance on that provision to sanction a massive rate disparity among storage customers who receive identical service is simply untenable.

**C.**     ***The Commission Fails to Reconcile its Direct Allocation Approach With its Contrary Policy for Allocating the Cost Responsibility for Network Upgrade Costs.***

The "but/for" approach adopted by the Commission in the proceedings below is also irreconcilable with the long-standing approach the Commission has taken in allocating cost responsibility for network upgrade costs associated with the interconnection of new electric generation.  In that context, the Commission explicitly considers the incidence of benefits resulting from the interconnection in

---

[40]  Initial Decision at P 171.

deciding what parties must bear the associated network upgrade costs, and in what proportion. The cost allocation issues addressed in that policy are very similar to those before the Commission in this proceeding, and, in fact, make a case for roll-roll-in of costs in a true expansion scenario. Accordingly, the Commission's generator cost allocation policy is both highly relevant and instructive.

BNPP Energy and South Jersey explained in their request for rehearing that when a new electric generator connects to the transmission grid, a series of studies are performed to determine what upgrades to the existing transmission network are needed to accommodate the interconnection. Under a long-standing Commission rule, the entity constructing the power plant is required to fund the costs of any upgrades that would not have been needed "but for" the interconnection.[41] However, once the power plant is constructed and placed in service, the plant's developer is entitled to receive a ***full reimbursement*** of such costs, which are then rolled into otherwise-applicable transmission rates and recovered from all users of the transmission network.

The Commission adopted this reimbursement policy based on the recognition that all users of the transmission network benefit when transmission

---

[41] This ensures that there is a source of funding for the facilities and provides an incentive for generation developers to make efficient siting decisions. *See Reliant Energy Choctaw County, LLC v. Entergy Services, Inc.*, 107 FERC ¶ 61,141 at P 16 (2004).

facilities are constructed, even if the nominal need for such facilities would not

have arisen "but for" the power plant's interconnection.    The Commission

explained this principle as follows:

> [T]he Commission has long held that the Transmission System is a
> cohesive, integrated network that operates as a single piece of
> equipment, and that network facilities are not "sole use" facilities but
> facilities that benefit all Transmission Customers.  The Commission
> has reasoned that, even if a customer can be said to have caused the
> addition of a grid facility, the addition represents a system expansion
> used by and benefiting all users due to the integrated nature of the
> grid.  For this reason, the Commission has consistently priced the
> transmission service of a non-independent Transmission Provider
> based on the cost of the grid as a whole, and has rejected proposals to
> directly assign the cost of Network Upgrades.[42]

Fundamentally, the same basic considerations underlying the Commission's

generator interconnection cost allocation policy are also present in this case.  While

While the nominal "but for" event that created the need for Transco's base gas

purchase may have been PSEG's and SJGC's purchase and withdrawal of base gas

quantities following their permanent releases of storage capacity to BNPP Energy

and South Jersey, the base gas purchased by Transco benefited all WSS-OA

storage customers equally.  In terms of "but for" causation, this circumstance is

---

[42]  *Standardization of Generator Interconnection Agreement and Procedures*,
FERC Stats. & Regs. ¶ 31,160 at P 585 (2004) (Order No. 2003-A), *reh'g*, FERC
Stats. & Regs. ¶ 31,171 (2004) (Order No. 2003-B), *reh'g*, FERC Stats. & Regs. ¶
31,190 (2005) (Order No. 2003-C), *citing, Public Service Company of Colorado*,
62 FERC ¶ 61,013 at p. 61,061 (1993).

similar from the construction of a transmission upgrade that is necessitated by the interconnection of a power plant, but that benefits all users of the transmission network.

To the extent that the Commission has determined that the costs of transmission upgrades should be allocated to all users of the network, and that doing so is consistent with the Commission's basic cost causation and allocation principles, then *a fortiori* the same principles should be applied in this proceeding to allocate base gas costs on a rolled-in basis to all WSS-OA storage customers that benefit from the purchase and use of that gas, and not selectively to BNPP Energy and South Jersey.  To do otherwise would be to apply different standards to similar similar situations, which the courts have determined to be arbitrary and capricious.[43]

At the very least, the Commission must provide a reasoned explanation for why the cost allocation principles developed under the Commission's regulation of the electric industry should not be applied here.  Baldly asserting that the generator interconnection policy is "not relevant" is not sufficient.  The policy is in fact relevant – not to mention highly instructive – because it addresses cost allocation issues in closely analogous factual circumstances.

---

[43] *See HC&D Moving & Storage Company v. United States*, 298 F. Supp. 746, 751 (D. Hawaii 1969).

The fact that the policy was adopted in the electric industry, and not the gas industry, is a distinction without a difference, because it is well-accepted that the statutes under which the Commission regulates both industries are similar and, therefore, are to be interpreted consistently.[44]  Moreover, this general principle has been applied specifically in the context of cost allocation and ratemaking.[45]  As such, the Commission should be required to apply the same cost allocation principles in this proceeding.  At the very least, the Commission was required to provide a reasoned explanation why those principles are not applicable.[46]  Its failure to do so constitutes reversible error.

---

[44]  *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 686 (D.C. Cir. 2000) (stating that "we have repeatedly recognized the similarity of the" Federal Power Act and Natural Gas Act "and held that they should be interpreted consistently") (citations omitted).

[45]  *See, e.g., PJM Interconnection, L.L.C.*, 138 FERC ¶ 61,230 at PP 115-116 (2012), *reh'g pending* (applying natural gas ratemaking principles in an electric proceeding, while noting certain relevant distinctions between those industries); *New Dominion Energy Cooperative and Old Dominion Electric Cooperative*, 122 FERC ¶ 61,174 at P 56, n. 82 (2008) (explaining that "holdings that apply to sections 4 and 5 of the Natural Gas Act also apply to sections 205 and 206 of the Federal Power Act").

[46]  The Commission routinely performs this type of analysis when applying precedents from different industries.  For example, a number of electric transmission cost allocation issues were before the Commission in *PJM Interconnection, L.L.C.*, 138 FERC ¶ 61,230 (2012), *reh'g pending*, and certain parties cited precedent under the Natural Gas Act in support of their arguments for how such issues should be resolved.  The Commission responded by first noting that "some care must be exercised in analogizing between the interstate natural gas pipeline and electric industries."  *Id.* at P 116.  The Commission then provided a footnote in which it discussed certain relevant differences between the two

## 2.    *The Commission Fails to Address and Reconcile Unrebutted Evidence that the Replenished Base Gas Volumes Support the Entitlements of the Historical Customers and that Transco's Allocation Proposal Forces BNPP Energy and South Jersey to Subsidize the Service of the Remaining Historical WSS-OA Customers.*

In rejecting the contention that BNPP Energy and South Jersey's storage entitlements were responsible for 100% of Transco's base gas purchases, the ALJ found that "at least a measurable portion of the replenishment base gas" was necessary to maintain the deliverability associated with the historical storage customers' entitlements:

> 132.   * * * [I]t is inaccurate to suggest that, "but for" Fortis and South Jersey having stepped into the shoes of PSEG and South Jersey Gas, Transco would not have purchased replenishment base gas. Doing so ignores the fact that when PSEG and South Jersey Gas left the Field and took their base gas option amounts with them, service to all customers remaining in the Field was degraded as a result.  As Staff points out under its own theory of the case, ***there is at least a measurable portion of the replenishment base gas purchased by Transco that, even in the absence of Fortis and South Jersey, would have been necessary to inject into the Field anyway in order to restore the top gas capacity and deliverability needs of the remaining customers when PSEG and South Jersey Gas removed their base gas option entitlements.***  WSS Customer Group similarly admits that in the absence of the replenishment base gas, the remaining customers' WSS and WSS-OA service may have been diminished.[47]

---

industries.  *See id.*, n. 229.  At the very least, the Commission should have provided that type of analysis in this case rather than merely asserting that the electric precedent cited by BNPP Energy and South Jersey was not relevant.

[47] Initial Decision at P 132 (*emphasis added*).

The ALJ further found that Transco's incremental rate proposal is unjust and unreasonable because it forces BNPP Energy and South Jersey to bear 100% of the costs the replenished base gas volumes despite the fact that those volumes supported their storage entitlements as well as those of the historical WSS-OA customers:

> 149.   As for the third factor, it cannot be said that rolling-in rates would result in a "subsidy" of new customers by old customers because there is no real way to parse the cost of base gas between them.  All base gas serves all top gas; it follows, therefore, that no one customer's top gas allotment can be said to cause more base gas cost than any other customer's.  Likewise, the replenishment of base gas withdrawn by PSEG and South Jersey Gas when they terminated their WSS-OA service, and Fortis and South Jersey took their places, cannot be attributed to the top gas capacity and deliverability needs of any one group of customers any more than it can be attributed to the needs of any other group of customers.  ***Incremental rates, by contrast, unquestionably impose a subsidy that Fortis and South Jersey would have to pay for the benefit of pre-existing customers, who count for approximately 89 percent of the capacity rights in the Washington Storage Field.  This is so because, in so doing, Fortis and South Jersey would be paying the whole cost for replenishment base gas that serves the needs of historic[al] customers as well as themselves.***[48]

In upholding Transco's proposal to allocate 100% of the base gas purchase costs to BNPP Energy and South Jersey, the Commission continues to ignore these factual findings and, further, to fail to explain how Transco's incremental rate approach can be deemed just and reasonable if it in fact requires BNPP Energy and South Jersey to subsidize the service of the remaining group of customers.

---

[48]  Initial Decision at P 149 (*emphasis added*).

As this court has recognized, the Commission may not simply disregard the findings of an ALJ, particularly when such findings are based upon substantial evidence in the record and the Commission's disregard of such findings is unsupported and unexplained.[49]

---

[49] *See, e.g., Panhandle Eastern Pipe Line Co. v. FERC*, 881 F.2d 1101, 1116 (D.C. Cir. 1989), *citing*, *Citizens State Bank v. FDIC*, 718 F.2d 1440, 1444 (8th Cir. 1983) (stating that "[a]n agency's departure from the ALJ's findings is vulnerable if it fails to reflect attentive consideration to the ALJ's decision"); *East Tennessee Natural Gas Co. v. FERC*, 953 F.2d 675, 681 (D.C. Cir. 1992) (stating that, "[b]ecause the ALJ relied on substantial evidence in the record, coupled with a well-reasoned and highly sensible analysis, in reaching a conclusion on the cost-shifting issue, we can find no basis upon which to accept the Commission's unsupported and ill-reasoned conclusion to the contrary").

## <u>CONCLUSION</u>

Petitioner BNPP Energy respectfully requests that the Court vacate the

Commission's orders and remand for implementation of WSS-OA rates reflecting

a full roll-in of all base gas purchases.

Respectfully submitted,

*/s/ Gordon J. Smith*
Gordon J. Smith
Matthew T. Rick
JOHN & HENGERER
1730 Rhode Island Ave., N.W.
Suite 600
Washington, D.C. 20036-3116
Telephone: (202) 429-8814
Email: gsmith@jhenergy.com

Attorneys for Petitioner
BNP Paribas Energy Trading GP
*f/k/a* Fortis Energy Marketing &
Trading GP

Filed: October 31, 2012

36

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and D.C. Circuit Rule 32(a), I hereby certifies as follows:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(C) and D.C. Circuit Rule 32(a) because this brief contains 8,576 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1). This calculation was made using the word count function of Microsoft Word 2007, the word-processing processing program used to prepare this brief.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman typeface.

*/s/ Gordon J. Smith*
Gordon J. Smith
JOHN & HENGERER
1730 Rhode Island Avenue, N.W.
Suite 600
Washington, D.C. 20036

October 31, 2012

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and the Court's Administrative Order Regarding Electronic Case Filing, I hereby certify that I have this day served the foregoing "Brief of Petitioner BNP Paribas Energy Trading GP" upon counsel listed in the Service Preference report by email through the Court's CM/ECF system or by first-class mail as indicated below:

Judith A. Albert                                        Email
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

James H. Byrd                                          Email
Miller, Balis & O'Neil, PC
Twelfth Floor
1015 15th Street, NW
Washington, DC 20005-2605

Marc J. Fink                                           US Mail
Cozen O'Connor
1627 I Street, NW
Suite 1100
Washington, DC 20006

David Allen Glenn                                      US Mail
Transcontinental Gas Pipe Line Corporation
PO Box 1396
Houston, TX 77251-0000

James H. Jeffries                                      Email
Moore & Van Allen, PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC 28202-4003

Ira G. Megdal                                            US Mail
Cozen O'Connor
1627 I Street, NW
Suite 1100
Washington, DC 20006


Jodi L. Moskowitz                                        Email
PSEG Services Corporation
80 Park Plaza, T5G
Newark, NJ 07102-4194


Robert H. Solomon                                        Email
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426


Michael J. Thompson                                      Email
Wright & Talisman, PC
1200 G Street, NW
Suite 600
Washington, DC 20005-1200


Dated at Washington, D.C. this 31st day of October, 2012.


                                 */s/ Gordon J. Smith*
                                 Gordon J. Smith
                                 Attorney for
                                 BNP Paribas Energy Trading GP *f/k/a*
                                 Fortis Energy Marketing & Trading
                                 GP

# <u>APPENDIX</u>

## ADDENDUM OF STATUTES AND REGULATIONS

## Table of Contents

**Natural Gas Act, 15 U.S.C. §§ 717, *et seq***

Section 2, 15 U.S.C § 717a(6) ..............................................................2

Section 4, 15 U.S.C § 717c ..........................................................3, 4, 5

Section 7(c), 15 U.S.C § 717f(c) ........................................................6

Section 19(a), 15 U.S.C § 717r(a) .....................................................7

Section 19(b), 15 U.S.C § 717r(b) ...................................................7, 8

1

## ADDENDUM:  STATUTES, RULES, REGULATIONS, ETC.

## Natural Gas Act ("NGA"), Section 2, 15 U.S.C § 717a(6)

(6) "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

**Natural Gas Act ("NGA"), Section 4, 15 U.S.C. § 717c**

**(a) Just and reasonable rates and charges.** All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

**(b) Undue preferences and unreasonable rates and charges prohibited.** No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Filing of rates and charges with Commission; public inspection of schedules**. Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from June 21, 1938) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Changes in rates and charges; notice to Commission.** Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and

3

the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Authority of Commission to hold hearings concerning new schedule of rates.** Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission, or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Storage services.**

(1) In exercising its authority under this chapter or the Natural Gas Policy Act of 1978 (15 U.S.C. 3301 et seq.), the Commission may authorize a natural gas company (or any person that will be a natural gas company on completion of any

4

proposed construction) to provide storage and storage-related services at market-based rates for new storage capacity related to a specific facility placed in service after August 8, 2005, notwithstanding the fact that the company is unable to demonstrate that the company lacks market power, if the Commission determines that –

(A) market-based rates are in the public interest and necessary to encourage the construction of the storage capacity in the area needing storage services; and

(B) customers are adequately protected.

(2) The Commission shall ensure that reasonable terms and conditions are in place to protect consumers.

(3) If the Commission authorizes a natural gas company to charge market-based rates under this subsection, the Commission shall review periodically whether the market-based rate is just, reasonable, and not unduly discriminatory or preferential.

**Natural Gas Act ("NGA"), Section 7(c), 15 U.S.C. § 717f(c)**

**(c) Certificate of public convenience and necessity.**

(1)(A) No natural-gas company or person which will be a natural - gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: Provided, however, That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: Provided, however, That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of - (A) natural gas sold by the producer to such person; and (B) natural gas produced by such person.

## Natural Gas Act ("NGA"), Sections 19(a) and 19(b),
## 15 U.S.C. §§ 717r(a) and (b)

**(a) Application for rehearing; time.**  Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Review of Commission order.**  Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall

7

apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.